## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

VICKIE MUNTER,

        Plaintiff,

v.

        **MEMORANDUM OF LAW & ORDER**
        Civil File No. 14-4575 (MJD/LIB)

LIFECARE MEDICAL CENTER,

        Defendant.

Daniel Gray Leland, Leland Law PLLC, Counsel for Plaintiff.

Hannah J. Woolsey, Kyle Alan Eidsness, Lisa Lamm Bachman, and Thomas A. Harder, Foley & Mansfield, PLLP, Counsel for Defendant.

## I.      INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment.  [Docket No. 21]  The Court heard oral argument on April 1, 2016. Because Plaintiff was not able to perform the essential job functions, with or without reasonable accommodation, and because she cannot show any prejudice under her Family and Medical Leave Act claim, the Court grants Defendant's motion.

## II.      BACKGROUND

1

### A. Factual Background

### 1. The Parties

Defendant LifeCare Medical Center ("LifeCare" or "Defendant") is a medical care provider headquartered in Roseau, Minnesota, with approximately 450 employees. (Compl. ¶ 2; Ans. ¶ 2; Klotz Dep. 11.) LifeCare has a nursing home facility in Greenbush, Minnesota, called LifeCare Greenbush Manor ("Greenbush"). (Compl. ¶ 8; Ans. ¶ 8.)

In 1993, Defendant hired Plaintiff Vickie Munter as a Licensed Practical Nurse ("LPN") at Greenbush. (Munter Dep. 9, 19.)

There are three shifts at Greenbush: AM from 6:30 a.m. to 3:00 p.m.; PM from 2:30 p.m. to 11:00 p.m.; and night shift from 10:45 p.m. to 7:15 a.m. (Gustafson Dep. 47-48.) Munter worked the PM shift. (Munter Dep. 23.)

There are two pods of residents, Edgewood and Rosewood. (Gustafson Dep. 29.) During the PM shift, each pod was generally staffed by one LPN and two Certified Nursing Assistants ("CNAs"). (Gustafson Dep. 47-48.) A Registered Nurse ("RN") usually worked during the AM shift. (Id. 48.)

Susan Lisell is the Vice President of Clinical Services for Defendant. (Lisell Dep. 7.) Lisell is the Administrator at Greenbush and oversees the Director of

Nursing.  (Id. 8, 11.)  Lisell's office is in Roseau, but she spends one to two days

per week at Greenbush.  (Id. 8.)

From January 2010 until January 2013, Kristi Gustafson was the Director of

Nursing at Greenbush.  (Gustafson 10.)  Today, Gustafson works as an RN at

Greenbush.  (Id.)  Gustafson had no role in Family and Medical Leave Act

("FMLA") leave requests.  (Munter Dep. 218; Gustafson Dep. 75-76; Klotz Dep. 9-

10.)

Carol Klotz is the LifeCare Director of Human Resources.  (Klotz Dep. 6, 8-

9.)  Klotz is responsible for tracking FMLA leave and for determining possible

accommodations for employees with disabilities.  (Id. 9, 15, 103.)  Klotz works in

Roseau and usually visits Greenbush once a month.  (Id. 10.)

Whitney Bengtson is an LPN who works the PM shift at Greenbush.

(Bengtson Dep. 8-9.)  Patti Robinson is an LPN who works the night shift at

Greenbush.  (Robinson Dep. 6-8.)  Corrina Christianson works as an LPN at

Greenbush on the AM and PM shift.  (Christianson Dep. 10, 13-14.)

### 2.   Job Duties

Greenbush LPNs are responsible for providing direct care to residents.

(LPN Job Descriptions, Exs. 1-5; Bengtson Dep. 71.)  They have a physically

demanding and fast paced job.  (Bengtson Dep. 46; Robinson Dep. 9, 12; Klotz

Dep. 72.)  The PM shift was more physically demanding than the AM shift

because there was less staffing.  (Bengtson Dep. 36.)

Greenbush LPNs do significant walking.  (See, e.g., Munter Dep. 191; Klotz

Dep. 26.)  They are required to push a heavy medication cart, which puts strain

on the LPNs' knees.  (See, e.g., Klotz Dep. 72; Munter Dep. 191.)

### 3.    2002-2003 FMLA Leaves

Munter took FMLA leave in the spring of 2002, in the fall of 2002, and in

the fall of 2003.  (Harder Aff., Ex. C.)  Munter testified that she did not perceive

any hostility or adverse consequences because of the 2003 leave.  (Munter Dep.

12.)

### 4.    Munter's Medical History

Munter has suffered from osteoarthritis or degenerative joint disease

("DJD") since April 2009.  (Munter Dep. 190-91, 214.)  Multiple coworkers

testified that they noticed that Munter was in pain and moved more slowly.

(Bengtson Dep. 12, 34-35; Robinson Dep. 10; Christianson Dep. 18-19.)

She had meniscal tear repair surgery to her left knee in 2009.  (Munter Dep.

16.)  In Munter's 2009 FMLA request, she checked the line stating that she had a

serious health condition that made her unable to perform her job duties.  (Id. 65.)

Defendant granted the 2009 FMLA request without any hesitation or resistance.

(Id. 16-17.)  Munter took FMLA leave from April 26, 2009, through the week of

July 12, 2009, and then took an additional 10-week leave of absence.  (Klotz Dep.

37-39; Harder Aff., Ex. C.)

In spring 2013, Munter had meniscal repair with chondral treatment in her

right knee.  (Munter Dep. 13-14, 16.)  In the spring of 2013, Munter requested and

received 8 weeks of FMLA leave for the procedure from February 2013 through

April 2013.  (Harder Aff., Ex. C.)  The leave was granted with no resistance or

hesitation.  (Munter Dep. 13-14.)  She returned to work in April 2013.  (Id. 14.)

After this surgery, Munter's pain got worse in both knees.  (Id. 13.)

Munter's doctor told her to take a week off of work beginning on June 24,

2013, and to try new medications.  (Munter Dep. 87; Leland Decl., Ex. 6;

Gustafson Dep. 21.)  Munter requested and was granted time off due to her knee

condition for June 24, 2013, to July 2, 2013.  (Munter Dep. 87-88.)

### 5.    Shift Scheduling

On July 8, 2013, Munter's doctor restricted her to not working more than

two days in a row.  (Munter Dep. 34; Leland Decl., Ex. 7.)  Munter told Gustafson

of this new restriction and informed her that she had DJD.  (Munter Dep. 56-57.)

Munter asked Virginia Brekke, Greenbush's scheduler, to schedule her primarily

in the Rosewood pod because Edgewood was more physically demanding;

Brekke did so, but Munter still sometimes had to work in Edgewood.  (Id. 25-27.)

In September 2013, Brekke told Munter that she was scheduled in

Edgewood for the next three shifts because there was a "train-in on Rosewood,"

and that the "only other way this would work is if [Munter] worked four days in

a row."  (Munter Dep. 33.)  Munter stated that it would be against her

restrictions.  (Id.)  Brekke responded, "All of this . . . could be handled better if

you worked every weekend."  (Id.)  Munter wrote a letter to Gustafson about the

conversation with Brekke and left it under Gustafson's door.  (Id.; Gustafson

Dep. 30, 33.)  Gustafson called Munter the next morning and told her that she

needed to watch how many restrictions she had or she would restrict herself out

of a job.  (Munter Dep. 33.)

### 6.    Work Performance

Munter's performance reviews from 2008 through 2012 ranked Munter as

"Meets Standards" or "Exceeds Standards" across all categories.  (Leland Decl.,

Exs. 1-5.)  Coworkers testified that Munter was a good nurse who helped other

nurses with her nursing expertise.  (See, e.g., Bengtson Dep. 33-34; Christianson Dep. 12, 26.)

### 7.    Timeliness

Munter testified that, after June 2013, she did not consistently comply with Defendant's attendance policy because she was "not punctual."  (Munter Dep. 45.)  However, she did not have a tardiness problem before developing osteoarthritis.  (Id. 202.)  Munter further testified, "Normally I worked over my shift."  (Id. 46.)

### a)    Late Arrival

Gustafson was responsible for reviewing all nursing employee timecards at Greenbush.  (Gustafson Dep. 35.)  Defendant's written policy provides: "Tardiness will be recorded when an employee punches in 8 minutes or more after their scheduled time.  Eight tardiness offenses will be allowed in each rolling calendar year."  (Leland Decl., Ex. 11.)  The ninth tardy results in an oral review.  (Id.)  The tenth tardy results in a written warning.  (Id.)  The eleventh tardy results in a written warning with a suspension without pay.  (Id.)  The twelfth tardy results in immediate termination.  (Id.)

### b)    Staying After Shift

Gustafson did not know if there was a policy that addressed employees working after their shift.  (Gustafson Dep. 43.)  She dealt with that issue on an "individualized" basis, usually when an employee was going to be arriving late so another employee was asked to stay late to cover.  (Id. 44.)  Munter's coworkers testified that LPNs sometimes have to stay after their shifts to finish charting and to make sure that their work is done properly.  (Christianson Dep. 13, 24; Robinson Dep. 13.)  Munter asserts that she normally stayed past the end of her shift and no one ever told her that this was inappropriate until after November 4, 2013.  (Munter Dep. 45-46.)

### 8.    Gustafson's Discussions with Bengtson

At some point, Gustafson spoke to Bengtson and stated that they would be accommodating Munter by having Munter only work on one pod and only work two days in a row at most.  (Bengtson Dep. 40.)  Gustafson asked Bengtson if she had any concerns with Munter's knees and Munter being at work.  (Id.)  Another time, Gustafson told Bengtson that Munter was having trouble, that Munter was not "going to be able to work in this job area much longer," and that Munter would need a "sit-down job" so that she did not need to call in late or stay late for her shift all the time.  (Id. 41.)

Sometimes, Gustafson asked Bengtson about Munter working slowly and would "vaguely ask" questions about Munter.  (Bengtson Dep. 42.)  Gustafson would ask Bengtson whether she knew that Munter was in extra pain, if Munter was trying to have surgery, if she was getting help for pain management, or if Munter had thought about taking time off from work.  (Id. 43.)  Based on Gustafson's demeanor, Bengtson interpreted these questions as Gustafson "gathering information to try to work towards firing her."  (Id. 43, 64.)

### 9.    September 7, 2013 Letters

In September 2013, coworker Patty Truscinski noted a late arrival by Munter.  (Harder Aff., Ex. D; Munter Dep. 95.)  Truscinski told Munter that Gustafson had told Truscinski to write Munter up when Munter was tardy because it was "a habit."  (Harder Aff., Ex. D.)

When Munter learned of the note from Truscinski, Munter wrote a letter to Gustafson dated September 7.  (Harder Aff., Ex. D; Munter Dep. 63.)  In the letter, she explained that she had been diagnosed with DJD and had severe pain in her knees and right elbow.  (Harder Aff., Ex. D; Munter Dep. 90.)  She stated that she was on medications to try to control the pain, but the side effects were tiredness.  (Harder Aff., Ex. D)  Sometimes she felt so tired that she needed to

sleep and did not feel safe to drive to work.  (<u>Id.</u>)  Munter also stated that she put

in extra hours many times, not because she was late but because she was busy.

(<u>Id.</u>)  She stated that she worked in a lot of pain and had left her shift in tears

because of the pain.  (Harder Aff., Ex. D; Munter Dep. 92.)  She admitted that she

had come in late to work and stated that, if there was a problem, Gustafson

should let her know.  (<u>Id.</u>)  She stated that her care plan was pain management

and to keep working.  (Harder Aff., Ex. D; Munter Dep. 93.)  She concluded that

Gustafson should contact her with any concerns.  (<u>Id.</u>)

Gustafson never provided Munter's September 7 letter to Klotz or Lisell;

nor did she discuss it with them.  (Gustafson Dep. 66-67.)

Soon after Munter provided the note, she asked to speak to Gustafson.

(Munter Dep. 60.)  They met a few days later and discussed Munter coming in

late.  (<u>Id.</u> 60-61.)  Munter told Gustafson that the pain medication she took made

her tired and explained the reasons why she was late.  (Munter Dep. 95-96.)

Munter stated that when she came in late, she called the RN on duty and

explained that this meant that there had been a nurse on the floor.  (<u>Id.</u>)

Gustafson stated that Munter's late arrivals were "disrupting work flow."  (<u>Id.</u>

96.)  Munter retorted that other employees came to work late.  (<u>Id.</u>)  Gustafson

stated that they only came in 30 minutes late.  (Id. 62, 96.)  Gustafson also raised

an example where Munter had stayed past the end of her shift by 3.5 hours.  (Id.

96.)

Munter also told Gustafson that she would leave work in tears because of

the pain, would ice her knees at home, had difficulty pushing the medication

cart, and moved slowly because of her knees.  (Munter Dep. 61.)  Gustafson

asked why Munter did not just go out on disability and explained that she had a

friend that had to go on disability.  (Id.)

Lisell wrote a note of Gustafson's report of the conversation with Munter.

(Leland Decl., Ex. 9; Lisell Dep. 51-52.)  The note provides that Gustafson and

Munter discussed Munter's attendance and Gustafson felt that the issue was

resolved.  (Leland Decl., Ex. 9; Lisell Dep. 52.)

Munter testified that she explained to Gustafson that she was staying past

her shift because the night-shift LPNs were incompetent and she could not leave

orders for them.  (Munter Dep. 207.)  Later, she told the same thing to Lisell and

then Gustafson "stopped me from being able to say what I wanted to say about

my degenerative joint disease," and said, "No, that's not it."  (Id.)

11

### 10.     October 2013 Discussion

Sometime in October 2013, Gustafson and Munter met and discussed Munter's problems of leaving late.  (Gustafson Dep. 81-82.)

### 11.     November 4, 2013 Leave Conversation

On October 30, 2013, Munter had an appointment with an orthopedic surgeon.  (Munter Dep. 48-49.)  The doctor informed her that there was no medical intervention possible other than a total knee replacement for both knees. (Id.)  Munter wanted to have a total knee replacement surgery on December 12, 2013.  (Id. 49.)

On November 4, 2013, Munter called Klotz to discuss a potential future knee surgery.  (Munter Dep. 49; Klotz Dep. 21-22.)  She also informed Klotz of her DJD diagnosis and that she needed two total knee replacements.  (Munter Dep. 46; Klotz Dep. 22.)  According to Munter, Klotz told her that she had used up all of her FMLA leave for 2013.  (Munter Dep. 49.)  Munter "knew" that she had probably used all of her FMLA leave, but was willing to take a personal leave of absence in order to have the knee replacement on December 12.  (Id.)  In fact, as of November 2013, Munter had 4 weeks left of FMLA leave.  (Klotz Dep. 24-25; Harder Aff., Ex. C.)

12

Munter told Klotz that she wanted a "regular" leave of absence so that she could have her knee replacement surgery on December 12.  (Munter Dep. 219.) Klotz encouraged Munter to wait to have surgery until February 22, 2014, when her FMLA leave would be renewed, because if she took personal leave, she would need to pay $900 per month for COBRA benefits and would have no guarantee of job reinstatement upon her return.  (Id. 50.)  Thus, Klotz "talked [Munter] out" of taking a personal leave of absence for her surgery and made her feel like she "was not supposed to take leave."  (Id. 50, 183.)  Klotz told Munter that if she could schedule the surgery in February 2014, she would have further FMLA leave available and her job reinstatement would be guaranteed.  (Id. 50.) Munter testified that, "[a]t that time I believed that [Klotz] was there to help me; that is why I did as she requested, or as she said."  (Id. 50-51.)

### 12.    November 21, 2013 Written Warning

On November 21, 2013, during a meeting with Lisell, Munter, and Gustafson, Gustafson gave Munter a written warning "for not following staffing schedule start & end times."  (Leland Decl., Ex. 13.)  The warning continued:

> Warning for tardiness & managing time discussed verbally at an earlier date & acknowledged this & noted that this was not ok.  On current payroll, 5 days punched-in past starting time, & 5 days punched out past shift time.  Need to be on time, & work on time

13

management in order [to] follow staffing schedule.  This also
interferes with other staff work schedule.

(Id.)

Gustafson told Munter "we need[] to see improvement from this day

forward, because we want to work with you and we want to move forward and

continue employment."  (Gustafson Dep. 85.)  When Munter told her that she

was taking medications that made her tired and made it difficult for her to make

her scheduled shift, Gustafson offered a different shift, suggested that she take

her medications at a different time, and offered her use of the Employees

Assistance Program ("EAP").  (Id. 85-86; Munter Dep. 201.)  Munter rejected the

EAP because she did not think it would have helped her DJD and rejected the

AM shift because she did not think that she could wake up for a morning shift.

(Munter Dep. 164-65.)  Eventually, Gustafson asked Munter to come up with

some suggestions on how to work within the company's expectations.

(Gustafson Dep. 86.)

Munter tried to tell them that her DJD and depression affected how she

came in and left work off schedule, but Gustafson cut her off and said, "No,

that's not it."  (Munter Dep. 200-01.)  On Munter's timecards, Munter had listed

the reasons why she stayed late as talking to family members, charting, and other

14

tasks.  (Gustafson Dep. 87.)  Munter also told them that she took pain

medications that made her sleepy and she sometimes felt unsafe to drive so she

needed to arrive late.  (Munter Dep. 59; Lisell Dep. 29.)  She offered to change her

medication schedule to reduce her late arrivals.  (Lisell Dep. 29.)  Munter stopped

taking a particular pain medication so that she could get to work on time.

(Munter Dep. 208-09.)

### 13.   Continued Attendance Issues

Between November 21, 2013, when Munter received a written warning,

and December 2, 2013, she punched in after 2:30 p.m. by between 1 and 6

minutes each day and punched out late by more than one hour every single day.

(Harder Aff., Ex. K.)  Munter does not contest the accuracy of the time records.

(Munter Dep. 100-03.)  The next shift after she received her written warning, she

punched out at 1:51 a.m., 2 hours and 51 minutes after the scheduled end of her

shift.  (Harder Aff., Ex. K; Munter Dep. 102-03.)

### 14.   December 2, 2013 Warning and Suspension

On December 2, 2013, Gustafson, Lisell, and Munter met, and Gustafson

provided Munter a written warning and two-day suspension.  (Munter Dep. 98,

103; Harder Aff., Ex. H.)  The written warning stated:

> (1) Reviewed time management on 11/21/13: DON & admin.  Time
> since this time has not met the requirements given on this day.
> (2) Have reviewed previously in the past working as a team member
> with other employees.  Focusing time on other staff's faults, &
> dealing [with] them in a non-team member way.
> Written warning & suspension given today for the above reasons.
> Will be suspended with no pay on December 3rd & 5th to have time
> to evaluate job performance.

(Harder Aff., Ex. H.)

During the meeting, Munter stated that she had not been tardy based on

the 8-minute policy.  (Munter Dep. 104.)  Gustafson explained that the discipline

was actually based on "clocking out late."  (Id.)  Munter tried to tell Gustafson

that, because of her DJD and depression, she was moving more slowly and was

coming in late and late to leave, but Gustafson interrupted her and said, "No,

that's not it."  (Munter Dep. 62, 131-32.)

Gustafson and Lisell talked with Munter about ways she could be more

efficient at her job and be more of a team player.  (Lisell Dep. 55-56; Munter Dep.

121.)  Munter told Gustafson and Lisell that she sometimes stayed late because

the night shift nurses did not know how to put orders into the computer system

and she could not leave them work like the AM shift did for the PM shift.

(Munter Dep. 128, 132-33.)  Munter's supervisors suggested that, in order to

leave on time, she spend less time with residents and their families and spend more time forming relationships with staff and leave on time.  (<u>Id.</u> 120, 123.)

Munter testified that she told Lisell, "If you want me to clock out at 11:00 o'clock and then go back and finish my job, I will."  (Munter Dep. 125.)  She explained, "That's how much I didn't care about it.  I needed to finish my job. Because there was nobody on the night staff that could do what I was doing." (<u>Id.</u>)  Lisell responded, "Oh, no, no, no, you can't do that."  (<u>Id.</u> 127.)  Munter told Lisell that, other than working off the clock, Munter did not know "what other alternative there is."  (<u>Id.</u> 127-28.)

Between December 2, 2013, and January 14, 2014, Munter punched out late every single shift, usually more by than one hour late.  She punched in at 2:30 p.m. only three times.  (Harder Aff., Ex. K.)

### 15.   Termination

On January 14, 2014, Gustafson, Lisell, and new Greenbush Manor Director of Nursing Tracey Masloff met with Munter, and Gustafson read aloud the termination notice.  (Gustafson Dep. 102-04; Munter Dep. 125.)  The notice stated:

> Upon review, written warning given on 11-21-13 followed by written warning and suspension on 12-2-13 given for needing

improvement in time management with start and stop times, tardy's [sic], and interfering with staff work flow.  Today, also reviewing excessive absentism [sic], reaching 9 absences within the rolling calendar year.

Upon review of dates worked: 1/02, 1/03, 1/06, 1/07, 1/09, and on previous schedules, it is noted you have continued to work above your scheduled hours.  By not performing to the above discussed expectations, today we are informing you that your employment with LifeCare is terminated, effective immediately, 01/14/2014.

(Leland Decl., Ex. 16.)

**B.      Procedural History**

On October 28, 2014, Munter commenced a lawsuit against LifeCare in

Minnesota state court, Roseau County.  The Complaint alleges: Count One:

Disability Discrimination in Violation of the Minnesota Human Rights Act

("MHRA"); Count Two: Failure to Accommodate in Violation of the MHRA;

Count Three: Reprisal in Violation of the MHRA; Count Four: Interference in

Violation of the FMLA; and Count Five: Retaliation in Violation of the FMLA.

Plaintiff has now withdrawn Count Five.  (See Opp. Brief at 23 n.15.)

On October 30, 2014, LifeCare removed the matter to this Court based on

federal question jurisdiction.  It now moves for summary judgment on all claims

against it.

**III.   DISCUSSION**

18

### A.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### B.   Count One: MHRA Disability Discrimination

#### 1.   Legal Standard

The MHRA prohibits an employer from discharging or otherwise

discriminating against an employee because of the employee's disability.  Minn.

Stat. § 363A.08, subd. 2.  Generally, a disability discrimination claim under the

MHRA is analyzed in the same manner as a claim under the ADA.  Kobus v.

Coll. of St. Scholastica, Inc., 608 F.3d 1034, 1038 (8th Cir. 2010).  Plaintiff can

prove her claim under the direct evidence framework or the McDonnell Douglas

burden-shifting framework.  See Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040,

1044 (8th Cir. 2005).  Neither party asserts direct evidence of disability

discrimination, and both proceed under the indirect analysis.

To establish a prima facie case of disability discrimination, "an employee

must show that she (1) is disabled within the meaning of the ADA, (2) is a

qualified individual under the ADA, and (3) has suffered an adverse

employment decision because of the disability." Kallail v. Alliant Energy Corp.

Servs., Inc., 691 F.3d 925, 930 (8th Cir. 2012).  "The burden then shifts to the

employer to articulate some legitimate, nondiscriminatory reason for the

employer's actions.  If the employer articulates such a reason, the burden returns

to the employee to show the employer's justification is a pretext." Lors v. Dean,

595 F.3d 831, 834 (8th Cir. 2010) (citations omitted).

> To demonstrate pretext, a plaintiff must present sufficient evidence
> to demonstrate both that the employer's articulated reason for the
> adverse employment action was false and that discrimination was
> the real reason. . . .  [T]he plaintiff must do more than simply create
> a factual dispute as to the issue of pretext; he must offer sufficient
> evidence for a reasonable trier of fact to infer discrimination.

Id. (citation omitted).

### 2.      Whether Munter Was Disabled

For the purposes of this motion, Defendant concedes that Munter has a

disability under the MHRA.  (See Opening Brief at 16.)

### 3.      Whether Munter Was a Qualified Individual

The Court holds that Defendant is entitled to summary judgment because

Munter cannot show that she was a qualified individual.  "To be a qualified

individual . . . an employee must (1) possess the requisite skill, education,

experience, and training for [her] position; and (2) be able to perform the

essential job functions, with or without reasonable accommodation."  Kallail, 691

F.3d at 930 (citation omitted).

"An employee who is unable to come to work on a regular basis [is] unable

to satisfy any of the functions of the job in question, much less the essential

ones."  Nesser v. TransWorld Airlines, Inc., 160 F.3d 442, 445 (8th Cir. 1998)

(citation omitted).  "An employee who cannot meet the attendance requirements

. . . cannot be considered a 'qualified' individual protected by the ADA."

Tjernagel v. Gates Corp., 533 F.3d 666, 673 (8th Cir. 2008) (citation omitted).  See

also Greer v. Emerson Elec. Co., 185 F.3d 917, 921 (8th Cir. 1999) ("[R]egular and

reliable attendance is a necessary element of most jobs.") (quoting <u>Nesser</u>, 160

F.3d at 445).

There is no dispute that Munter was chronically late to arrive for her shift

and significantly late to leave after her shift ended.  Moreover, Munter admits

that these issues became more severe in June 2013.  These attendance issues

failed to resolve, even after progressive discipline and clear warnings.  Munter

was still staying late for between 48 minutes and more than 3 hours every shift

during her last month of employment.  During the time between her December 2

suspension and her termination, she also punched in 43, 20, and 11 minutes late.

Regular attendance during the scheduled shift is an essential job duty,

particularly for a shift-based job that required in-person LPN coverage to assist

residents.  Munter has been unable to point to any accommodation that would

have allowed her to arrive and leave on time.  Defendant offered her another

shift time, offered the EAP, suggested that she change her medication schedule,

and asked Munter for suggestions.  The only suggestion she gave to her

employer was to allow her to illegally work off the clock.  In her brief, Munter

asserts that Defendant could have staffed a CNA on the PM shift, but hiring a

new employee, creating a new position, or reassigning existing employees are

not reasonable accommodations.  See Fjellestad v. Pizza Hut of America, Inc., 188

F.3d 944, 950 (8th Cir. 2006).  Munter also argues that Defendant should have

granted her an extended multi-month leave, beyond her 12-week FMLA leave

entitlement, but this accommodation would not have addressed her attendance

issues: Munter would still not have been regularly attending work during her

shift.  Moreover, the PM shift was staffed with one LPN, with Munter

unavailable, Defendant would have been required to fill that position with

another individual.

### C.    Count Two: Failure to Accommodate in Violation of the MHRA

The MHRA provides that it is illegal for an employer to "not to make

reasonable accommodation to the known disability of a qualified disabled person

. . . unless the employer, agency, or organization can demonstrate that the

accommodation would impose an undue hardship on the business, agency, or

organization."  Minn. Stat. § 363A.08, subd. 6.

In order to survive a motion for summary judgment for failure to

accommodate under the MHRA, a plaintiff "must present evidence sufficient to

permit a reasonable jury to conclude that he was (1) disabled within the meaning

of the MHRA, (2) qualified to perform the essential functions of the job with or

without reasonable accommodation, and (3) suffered an adverse employment

action because of his disability." <u>Kammueller v. Loomis, Fargo & Co.</u>, 383 F.3d

779, 784 (8th Cir. 2004) (citation omitted).  Furthermore, the plaintiff "must also

show that his employer knew of, and failed to reasonably accommodate, his

disability." <u>Id.</u> (citing Minn. Stat. § 363A.08 subd. 6).

Because, as discussed with regard to Count One, Munter cannot show that

she was a qualified individual, Defendant is entitled to summary judgment on

Count Two.

### D.    Count Three: Reprisal in Violation of the MHRA

#### 1.    Reprisal Standard

Under the MHRA,

> [i]t is an unfair discriminatory practice for any individual who
> participated in the alleged discrimination as a[n] . . . employer . . . to
> intentionally engage in any reprisal against any person because that
> person [] opposed a practice forbidden under this chapter or has
> filed a charge, testified, assisted, or participated in any manner in an
> investigation, proceeding, or hearing under this chapter . . . .

Minn. Stat. § 363A.15, subd. 1.

"To defeat summary judgment on a retaliation claim, a plaintiff must

produce either direct evidence of retaliation, or create an inference of retaliation

under the <u>McDonnell Douglas</u> burden-shifting framework."  <u>Pye v. Nu Aire, Inc.</u>,

641 F.3d 1011, 1020 (8th Cir. 2011) (citations omitted).  Under the <u>McDonnell</u>

<u>Douglas</u> framework,

> an employee has the initial burden of establishing a prima facie case
> of retaliation by showing that (1) he engaged in protected conduct,
> (2) he suffered a materially adverse employment action, and (3) the
> adverse action was causally linked to the protected conduct.  If an
> employee establishes a prima facie case of retaliation, the burden
> shifts to the employer to articulate a legitimate, non-retaliatory
> reason for its action; if the employer does so, the burden then shifts
> back to the employee to put forth evidence of pretext, the ultimate
> question being whether a prohibited reason, rather than the
> proffered reason, actually motivated the employer's action.

<u>Id.</u> at 1021 (citations omitted).

## 2. Protected Activity

It is unclear which activity Munter claims was the protected activity of

requesting reasonable accommodation under the MHRA.   The Court will

analyze her claim both in relation to her September 2013 letter to Gustafson

regarding her DJD and to her November 2013 leave discussion between Klotz.

Assuming without deciding that both of these activities were protected activities

under the MHRA, Defendant is entitled to summary judgment based on the lack

of causal connection.

### 3. Adverse Employment Action

Munter suffered an adverse employment action when she was fired on January 14, 2014.

### 4. Causal Connection

Interpreting Munter's protected activity to be her September 2013 letter to Gustafson regarding her DJD, Defendant did begin disciplining Munter one month later based on her late arrivals and departures. However, the timing is insufficient to show a prima facie case of causation because Munter's September 2013 letter to Gustafson was written in response to a coworker writing Munter up for tardiness because management had told the coworker that Munter's tardiness was a problem. Thus, according to Munter, Defendant had already begun singling her out for her tardiness before she wrote the September 2013 letter. Munter, herself, admits that, beginning in June 2013, she was not punctual and that she usually worked after her shift ended. She further testified that she did not have a tardiness problem before this time period. Additionally, Munter testified that Defendant began treating her "differently" and in a retaliatory manner beginning in July 2013 (Munter Dep. 106-07), before Munter allegedly requested accommodation in September 2013.

Alternatively, the Court could interpret the November 2013 leave discussion between Klotz and Munter as the protected activity.  In that case, written discipline followed soon after.  However, Munter had already received an oral warning beforehand and, according to Munter, she was treated "differently" before the November meeting.  Munter further admits that she was not punctual after June 2013 and does not dispute the accuracy of the time records showing that she continued to have late arrivals and to consistently be substantially late in leaving her shift up until her termination.  Moreover, Defendant had previously granted Munter's five prior FMLA requests and her personal leave requests, all without hesitation or negative reaction.  Overall, the Court concludes that Munter cannot show a causal connection.

### E.      Count Four: Interference in Violation of the FMLA

#### 1.      Standard for FMLA Interference or Entitlement

The FMLA provides eligible employees up to 12 weeks of unpaid leave during any 12-month period for, among other things, "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  "Under the FMLA, employers are prohibited from interfering with, restraining, or denying an employee's exercise

or attempted exercise of any right contained in the FMLA." <u>Quinn v. St. Louis</u>

<u>Cty.</u>, 653 F.3d 745, 753 (8th Cir. 2011) (citing 29 U.S.C. § 2615(a)(1)).

The Eighth Circuit has recognized

three categories of FMLA claims arising under 29 U.S.C. § 2615(a)(1)-
(2): (i) entitlement claims, in which an employee alleges a denial of a
benefit to which he was entitled under the statute; (ii) discrimination
claims, in which an employee alleges that the employer
discriminated against him in the terms and conditions of
employment because the employee exercised rights to which he was
entitled under the FMLA; and (iii) retaliation claims, in which an
employee alleges that the employer took adverse action against him
for opposing a practice made unlawful under the FMLA.

<u>Johnson v. Wheeling Mach. Prods.</u>, 779 F.3d 514, 517-18 (8th Cir. 2015).  In an

entitlement claim, previously called an interference claim, "an employee must

show only that he or she was entitled to the benefit denied." <u>Id.</u> at 518 (citation

omitted).

"[A] plaintiff proceeding under the FMLA must show actual monetary loss

to recover." <u>Hasenwinkel v. Mosaic</u>, 809 F.3d 427, 434 (8th Cir. 2015).  The FMLA

"provides no relief unless the employee has been prejudiced by the violation."

<u>Ragsdale v. Wolverine World Wide, Inc.</u>, 535 U.S. 81, 89 (2002), <u>quoted in</u>

<u>Hasenwinkel</u>, 809 F.3d at 434.  <u>See also</u> <u>McBurney v. Stew Hansen's Dodge City</u>,

<u>Inc.</u>, 398 F.3d 998, 1002 (8th Cir. 2005).

2.      **Analysis**

According to Munter, Klotz mistakenly told her that, as of November 2013, she had used up all of her FMLA leave so that if she took her leave of absence at that time she would have no guaranteed job reinstatement and would have to pay COBRA.  Klotz further stated that that if Munter waited to take her leave until her FMLA leave bank replenished, in February 2014, she would not have to pay COBRA and she would have guaranteed job reinstatement.  In fact, as of November 2013, Munter had four weeks of FMLA leave available.  Thus, Munter asserts that Klotz told her that none of her two-to-three-month recovery and leave period would be covered by the FMLA, but that Klotz should have said that the first four weeks of her two-to-three-month recovery would have been covered by the FMLA.

There is no evidence that Klotz's misstatement regarding whether Munter had four weeks of FMLA leave available deterred Munter from taking FMLA leave.  Munter does not dispute that she needed and requested multiple months' leave.  It is undisputed that 4 weeks' leave was insufficient to cover her surgery and recovery.  Therefore, Klotz's statement that, if Munter had her surgery and took leave before February 2014, Munter would need to pay for COBRA and would not have a job guaranteed by the FMLA when she returned was true even

though Munter had four weeks of FMLA leave available.  Klotz's misstatement

regarding the four remaining weeks of FMLA leave was not material.

Munter has not shown that she would have taken the four weeks of FMLA

leave in December if she had been told that it was available.  Her surgery

rendered her unable to work for substantially longer than the available 4 weeks

of FMLA leave.  "The FMLA provides no relief unless the employee has been

prejudiced by the violation."  Pulczinski v. Trinity Structural Towers, Inc., 691

F.3d 996, 1006 (8th Cir. 2012) (citation omitted).  Because Munter cannot show

that Klotz's misstatement regarding the four weeks of FMLA leave available

prejudiced her, Defendant is entitled to summary judgment.

Accordingly, based upon the files, records, and proceedings herein**, IT IS

HEREBY ORDERED**:

Defendant's Motion for Summary Judgment [Docket No. 21] is
**GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  May 16, 2016                    s/ Michael J. Davis
                                        Michael J. Davis
                                        United States District Court